UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| **PORTLAND DEVELOPMENT CORPORATION,** ) | |
| ) | |
| **PLAINTIFF** ) | |
| ) | |
| v. ) | **CIVIL NO. 2:15-CV-442-DBH** |
| ) | |
| **M/V NOVA STAR,** *in rem*, ) | |
| ) | |
| **DEFENDANT** ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On August 23, 2016, I conducted a bench trial of the Portland Development Corporation ("PDC")'s claim to a maritime lien on the M/V Nova Star ("Nova Star"). I heard closing arguments the next day. The following are my findings of fact and conclusions of law. See Fed. R. Civ. P. 52.

**FINDINGS OF FACT**

1. In 2013, Singapore Technologies Marine Ltd. ("ST Marine") and Quest Navigation, Inc. ("Quest") entered into a joint venture to operate a ferry service between Yarmouth, Nova Scotia and Portland, Maine.

2. ST Marine and Quest incorporated Nova Star Cruises Ltd. in Nova Scotia to operate the ferry service. ST Marine owned ten percent of the company.

3. Nova Star Cruises Ltd. chartered a vessel owned by ST Marine, the M/V Nova Star, to make the crossing.

4. The City of Portland wanted to restore Yarmouth-Portland ferry service, which had lapsed in 2009.

5. The City of Portland owned premises on the Portland waterfront called Ocean Gateway.

6. The City of Portland leased Ocean Gateway to Nova Star Cruises Ltd. to serve as a location where the ferry could embark and disembark passengers, passenger vehicles, and commercial vehicles. The lease granted Nova Star Cruises Ltd. unrestricted exclusive use over the office and ticketing space at the Ocean Gateway departure building to be used for ticketing operations and general passenger support purposes. It also granted Nova Star Cruises Ltd. time-limited use—from the hours of 5:00 p.m. to 11:00 p.m. during ferry season—over the "queuing area" where cars, commercial vehicles, and passengers would pass through U.S. Customs as they embarked and disembarked the ferry. The lease granted Nova Star Cruises Ltd. time-limited use—between 7:00 p.m. and 11:00 p.m. during ferry season—of the berthing channel at Ocean Gateway. Nova Star Cruises Ltd. was also able to access the berthing channel outside those hours if the channel was reasonably available, but the City of Portland had a right to assign a secondary berth to Nova Star Cruises Ltd. The lease granted Nova Star Cruises Ltd. time-limited use—5:00 p.m. to 9:00 p.m. during ferry season—of the terminal building at Ocean Gateway for the processing of passengers and related functions by U.S. Customs.

7. Because the Portland-Yarmouth crossing is an international crossing, the parties needed to accommodate United States Border Patrol and Customs requirements, which included alterations and additions to Ocean Gateway.

8. The PDC, a nonprofit corporation operated by the City of Portland, decided to enter into a loan agreement with Nova Star Cruises Ltd. Initially, the PDC sought guarantees from each of ST Marine and Quest. When that request was rebuffed, the PDC sought a purchase money security interest in all assets being financed, acquired, or installed under the loan and a third security position on all business assets of Nova Star Cruises Ltd. as collateral for its loan to Nova Star Cruises Ltd. That request, too, was rebuffed. The staff of the PDC recommended that the PDC nevertheless proceed with the loan on an "unsecured" basis, because the benefit to the City (improvements to Ocean Gateway, employment, and the local economy) supported resuming ferry service between Yarmouth and Portland. Ultimately the PDC agreed that it would take no security interest in any business assets of Nova Star Cruises Ltd., but that the City of Portland would have actual ownership over the assets at Ocean Gateway that the PDC loan financed.

9. The PDC agreed to advance up to $250,000 as an unsecured loan to fund the alterations and additions to Ocean Gateway required for the ferry service. Nova Star Cruises Ltd. signed a promissory note to repay the advances at five percent interest over a period of six years, the first payment scheduled for May 1, 2014 and the final payment scheduled for May 1, 2020. Nova Star Cruises Ltd. executed the loan agreement and the promissory note through its President, Mark Amundsen. Nova Star Cruises Ltd. designated the City of Portland its agent to make the alterations and improvements at Ocean Gateway and to advance the money for materials and labor accordingly.

10. As it turned out, Nova Star Cruises Ltd. terminated the ferry service in 2015 after just two seasons.

11. A number of creditors seized the M/V Nova Star through process originating in this court, asserting maritime liens against it. Most of the claims have been resolved, and ST Marine as owner of the vessel posted a bond that allowed the vessel to leave the port of Portland while the remaining claims are resolved.

12. The PDC is one of two remaining creditors who claim a lien that has not been satisfied. The PDC seeks $162,878.88 that it advanced for improvements at Ocean Gateway under the loan agreement, funds that it says have not been repaid by Nova Star Cruises Ltd.

13. The PDC claims that the funds it advanced through the loan were for "necessaries" furnished to the vessel and therefore entitled to lien status. Generally, the funds provided for the leasing of a trailer that the Border Patrol used for secondary screening, along with sewer and electricity requirements; additional fencing that separated incoming from outgoing ferry traffic; installation of wireless communications fiber at the site; and bulletproof glass installed in the Customs booths.

14. The City of Portland purchased outright all the materials and it owns everything installed at Ocean Gateway except the trailer. The trailer was leased by the City of Portland and is still on the site, now being used by the replacement ferry company, Bay Ferries. Some fencing has been removed to accommodate different traffic patterns for the new ferry service. The bulletproof glass in the Customs booths continues to be used. The communications fiber has been

removed and replaced to accommodate the new ferry arrangements at Ocean Gateway.

## CONCLUSIONS OF LAW

A.   This court has jurisdiction under 28 U.S.C. § 1333(1).[1]

B.   Under federal maritime law, "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel." 46 U.S.C. § 31342. It "is not required to allege or prove in the action that credit was given to the vessel." Id.[2]

C.   "[P]ersons who are presumed to have authority to procure 'necessaries' to a vessel . . . include the owner, the master, 'a person entrusted with the management of the vessel at the port of supply,' or an officer or agent appointed by the owner or 'a charterer' of the vessel." Cianbro Corp. v. George H. Dean, Inc., 596 F.3d 10, 14 (1st Cir. 2010) (quoting 46 U.S.C. § 31341). I conclude that Nova Star Cruises Ltd., as charterer of the vessel Nova Star, and Mark Amundsen, as President of Nova Star Cruises Ltd., had authority to procure necessaries for the ship.

---

[1] "The district courts shall have original jurisdiction, exclusive of the courts of the States, of "(1) Any civil case of admiralty or maritime jurisdiction . . ."

[2] The First Circuit continues to maintain that it is a "well-established precept that the requirements for the allowance of a maritime lien are strictly construed." Cianbro Corp. v. George H. Dean, Inc., 596 F.3d 10, 14 (1st Cir. 2010). Some other courts have said that the 1971 amendments to the Federal Maritime Lien Act liberalized this standard, see, e.g., Atl. & Gulf Stevedores, Inc. v. M/V Grand Loyalty, 608 F.2d 197, 201 (5th Cir. 1979) ("We view the legislative history of these sections to mandate a more liberal application than that which existed prior to the 1971 amendments to the Maritime Lien Act. Our review leads us inexorably to the conclusion that it was the intent of the Congress to make it easier and more certain for stevedores and others to protect their interest by making maritime liens available where traditional services are routinely rendered."). I follow Cianbro, but in this case the choice of standard does not affect my conclusion.

D.    What the PDC provided to the Nova Star were "advances." "The rule of advances has three significant requirements: (1) that the money be advanced to a ship, (2) that it be advanced on the order of the master or someone with similar authority, and (3) that the money be used to satisfy an outstanding or future lien claim." Tramp Oil & Marine, Ltd. v. M/V Mermaid I, 805 F.2d 42, 45 (1st Cir. 1986). I find it necessary to look at only the third requirement, and there I look at what the advances were used for to see if they would justify a maritime lien claim.

E.    According to the statute, the term "necessaries" "includes repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). But 46 U.S.C. § 31301(4) is not an exhaustive list. Case law has amplified that list to include wharfage necessary for "loading and unloading cargo and receiving and landing passengers," Ex Parte Easton, 95 U.S. 68, 73 (1877), vendors providing embarkation services such as ticketing passengers and collecting passports, Kaleidoscope Tours v. M/V Tropicana, 755 F. Supp. 382, 385 (S.D. Fla. 1990), and the rental of an oil pipeline to supply oil to a ship, Clubb Oil Tools, Inc. v. M/V George Vergottis, 460 F. Supp. 835, 840 (S.D. Tex. 1978). The improvements and alterations made at Ocean Gateway are similar to the wharfage and embarkation services that case law has determined to qualify as necessaries. Although there must be some limiting principle as to where wharfage and embarkation services end and where mainland infrastructure begins, I conclude that the Ocean Gateway fencing, trailer, utility and cables, bulletproof glass, and the other supplies purchased to accommodate the U.S. Customs constitute "necessaries" under 46 U.S.C. § 31301.

6

F.  "It has long been the law that an essential element of establishing a maritime lien is that the necessaries be either (1) physically delivered to the vessel, or (2) constructively dispatched to the vessel by the handing over of the supplies to the owner or the owner's authorized agent for use on the designated vessel." Cianbro, 596 F.3d at 14-15 (citing Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 6-7 (1920)).  The materials and improvements at Ocean Gateway were not physically delivered to the Nova Star—they remained firmly on dry land.  Setting aside the question whether the materials were "for use *on* the designated vessel," I cannot conclude in Cianbro's terms that they were even "constructively dispatched to the vessel by the handing over of the supplies to the owner or the owner's authorized agent."  The PDC has argued that it was acting as the Nova Star's agent when it disbursed the loan, leased the trailer, and ordered and obtained the various improvements directly from contractors.  But under the loan documents, the City took outright ownership of all the improvements and installations.[3]  Thus, at all times the necessaries were purchased by, owned by, controlled by, and delivered to the City of Portland.[4]  Although Nova Star Cruises Ltd. had exclusive tenancy rights over the ticketing space at Ocean Gateway, for the rest of the premises (queuing

---

[3] Except for the trailer for office space for U.S. Customs and Border Protection. The trailer was leased from a third party, but the City was the party to that contract (albeit it listed itself as agent for Nova Star Cruises Ltd.).

[4] When queried at oral argument on the issue of delivery, counsel for the PDC indicated that because the City of Portland made the improvements at Ocean Gateway *for the benefit* of Nova Star Cruises Ltd., it thereby delivered the improvements and installations to Nova Star Cruises Ltd.  That alone is insufficient.  See Cianbro, 596 F.3d at 14-15 (denying subcontractor's claim to a maritime lien where—despite carrying out work for the ultimate benefit of the vessels—subcontractor only delivered necessaries to general contractor, rather than to the vessels or their owners.)

7

area, terminal area, berthing channel) it was a tenant only during certain hours of the day during the ferry season.  The City of Portland was free to use these spaces (and thus the necessaries) outside Nova Star Cruises Ltd.'s exclusive tenancy timeframes.  I conclude that for the purposes of the Federal Maritime Lien Act, the necessaries were neither physically delivered to the vessel, nor constructively dispatched to the vessel. Therefore, the advances the PDC made for the items in question would not justify a maritime lien claim.

G. There is another hurdle. The lienor need not prove that it relied on the credit of the vessel in providing necessaries. Instead, there is a rebuttable presumption that it did so. See Racal Survey U.S.A., Inc. v. M/V Count Fleet, 231 F.3d 183, 189 (5th Cir. 2000) ("[T]he [Federal Maritime Lien Act] . . . create[s] a presumption of credit based on the vessel.").  Nevertheless, the Federal Maritime Lien Act

> did not do away with the "idea of credit to the vessel being a prerequisite to a lien" . . . . Because under the [Federal Maritime Lien Act] a presumption arises that one providing supplies to a vessel acquires a maritime lien, the party attacking the presumption must establish that the personal credit of the owner or the charterer was solely relied upon. "To meet this burden, evidence must be produced that would permit the inference that the supplier purposefully intended to forego the lien."

Id. (citations omitted) (quoting Equilease Corp. v. M/V Sampson, 793 F.2d 598, 605-06 (5th Cir. 1986)).  The lien can be waived, and the "waiver need not be express." P.R. Ports Auth. v. Barge Katy-B, 427 F.3d 93, 103 (1st Cir. 2005).  But the party claiming a waiver bears a "heavy burden" of showing "affirmative steps that made manifest a definite intention to forgo the lien and . . . rely for payment solely on the creditworthiness of the vessel's owner," a determination "deeply

embedded in the facts." Id.  In Equilease, there was testimony that at the time of advancing the credit, the creditor/would-be lienor was looking to the resources of "only" the owner and a charterer.  The Fifth Circuit concluded that testimony was sufficient to rebut the presumption that the creditor was relying on the credit of the vessel.  Equilease, 793 F.2d at 606-07.  The creditor's testimony on direct examination that "[t]here [was] no intent for us to give up anything" was not sufficient to preserve the presumption of the lien.  Id. at 606; see also Cianbro, 596 F.3d at 16 (finding an absence of reliance on the credit of the vessel where "[t]here is no evidence in the record that would support a conclusion that [the claimant] relied on the Vessels' credit in supplying its steel and labor to [a subcontractor].").  Here, the evidence shows that the PDC initially attempted to obtain loan guaranties from ST Marine and Quest as owners of Nova Star Cruises Ltd.  That attempt failed.  The PDC then sought a lien on Nova Star Cruises Ltd.'s assets.  That attempt also failed.  Staff continued to recommend the loan to the PDC board as an "unsecured" loan, on the basis that the City of Portland was obtaining ownership of the financed improvements and that the City had a public interest in restoring ferry service.  The ultimate loan as approved was in fact unsecured.  At trial, the PDC Assistant Secretary Greg Mitchell testified that no one "ever communicated an intention to waive any rights . . . with respect to realizing on the amounts that are owed to the PDC," but I conclude that in the context of the other evidence, such a statement is insufficient, just like the creditor's statement in Equilease ("[t]here [was] no intent for us to give up anything").  793 F.3d at 606.  I conclude that the PDC's actions in the course of negotiations and its clear intention to go forward with an "unsecured" loan

demonstrate that it did not rely upon the credit of the Nova Star when it made the loan. Even if the necessaries had been delivered to the Nova Star, the PDC waived its claims to a maritime lien.

H. The PDC may yet have valid contract claims against the entity Nova Star Cruises Ltd. As to the claim litigated here, however, I conclude that because the PDC's loan advances were for necessaries not "physically delivered to the vessel or constructively dispatched to the vessel by the handing over of the supplies to the owner or the owner's authorized agent for use on the designated vessel," and because it waived its claims to a maritime lien when it negotiated an unsecured loan, the PDC cannot assert a maritime lien against the Nova Star.

The Clerk shall enter **JUDGMENT** for the defendant.

**SO ORDERED.**

**DATED THIS 7TH DAY OF SEPTEMBER, 2016**

/s/ D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

10